Lawrence M. GARY and Margaret W. Gary, Appellants,

v.

Ernest B. DANE, III, Appellee.

No. 21721.

United States Court of Appeals District of Columbia Circuit.

Argued June 17, 1968.

Decided Feb. 12, 1969.

Mr. William H. Greer, Jr., Washington, D. C., for appellants.

Mr. Gerald P. Johnston, Washington, D. C., with whom Mr. William V. Kane, Washington, D. C., was on the brief, for appellee.

Before BAZELON, Chief Judge, WRIGHT and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge.

This case involves a dispute over a strip of land two and one-half feet wide immediately south of appellants' home. Record title is in appellants' name, but the District Court held appellee obtained ownership through adverse possession. Our judgment is essentially one of affirmance, though we remand for provision of a paragraph in the decree to provide appellants certain protection.

The houses now owned by appellants and appellee, on the east side of 29th Street, N.W., in the Georgetown area of Washington, have been separated, since at least 1938, by a brick walkway that is five feet wide, and runs eastward back from the street some 90 feet. The strip in dispute is the northern half of this walk, the part immediately adjacent to appellants' home. A ten inch drain is depressed in the northern portion of the walkway and parallels appellants' south wall, draining their backyard into the street sewer. In the rear (east) of appellants' house, extending the line of their south wall, is a wooden fence running east to a brick fence at the rear of the two lots. The disputed strip consists of the two and one-half feet between the record title line, which runs down the middle of the brick walk, and the east-west line of appellants' south wall and wood fence.

Shortly after appellants acquired their premises in February, 1964, they cut a gate in the wood fence so that they could use the walkway south of their house.[1] Two years later, in May, 1966, while placing a new surface on the southern face of the wood fence, appellee[2] nailed

---

1. Appellants acquired their property from the Linthicum Institute of Georgetown, which has owned it since 1893. From January 1944 until the purchase by ap-

pellants, the house was rented to a Mr. and Mrs. Wilson.

2. Appellee bought his premises to the south in August of 1961, from the Riggs

shut this opening in the fence. Appellants sued in the District Court for damages and for an injunction restraining appellee's use of the strip. The District Court granted judgment to appellee on his counterclaim, holding appellee's title to the strip established by adverse possession,[3] but inserting a condition requiring appellee to reimburse appellants $139.20 for back taxes.

Our scope of review is to determine whether the trial court's decision was clearly erroneous, in regard to the inferences reflected in its fact findings,[4] or rested on unsound doctrine so far as legal rulings are concerned. We find no such error and accordingly affirm.

Under the District Code, a person obtains valid title to land by adverse possession which is actual, exclusive, continuous, open and notorious for 15 years.[5] While casual acts are not enough to establish ownership by adverse possession,[6] there is a presumption, effective to establish title in the absence of evidence to the contrary, that the possession is adverse whenever there is "open and continuous use of another's land." [7]

There is plainly support in this record for the District Court finding of adverse possession. From at least 1938, the disputed strip was bordered by appellants' house wall and wooden fence, and was so situated as to appear to all as a part of appellee's walkway and backyard. From 1936 until the 1961 sale, appellee's predecessor in possession, two life tenants (*supra* note 2), used the

walkway daily and had an entrance to their house in this walk until appellee removed it in 1961. They stored garbage containers and firewood in the walkway. On several occasions they maintained the drain adjoining the house now occupied by appellants, by having it cleared. They repaired and painted the wooden fence that appellants now claim is wholly within their property. One of these life tenants, Mrs. Purcell, planted rose bushes next to the fence, and thus on the disputed strip. According to undisputed testimony, she worked in the garden cultivating the roses nearly every day in season; she talked about them as her flowers; and on occasion she invited others into the garden to see them. These facts reveal more than random or haphazard incidents. They reflect intentional use by Mrs. Purcell and her sister of the disputed property as their own, without any evidence of permission sought or accommodation given.

The claim of adverse possession is further substantiated by the testimony of the record owner's predecessor in possession. Mrs. Wilson, who rented appellants' house from 1944 to 1964, stated that she never used the walkway and did not feel she had any right to do so. She assumed without question that the south wall of her house was the boundary. On one occasion she even had a tree in her backyard cut up and hauled through her basement, a burden not likely or lightly assumed if she thought she had a right to use the walkway. Mrs. Wilson also stated that she did not believe that the drain south of her house was her drain,

---

National Bank, a successor trustee under the will of Clara Noyes who died in 1926. The Clara Noyes Trust gave life tenancies to her two sisters. Following the death of one sister in 1950, and the departure of the other from Washington in 1961, the trustee-bank decided to sell the premises.

3. The court found that since the fall of 1938 appellee and his predecessors in title "have openly, notoriously, exclusively, continuously, actually, and adversely occupied the property strip in question."

4. Fed.R.Civ.P. 52(a); Mount Zion Methodist Church v. Unknown Heirs at Law etc., 114 U.S.App.D.C. 243, 314 F.2d 248 (1963); Knight v. Hersh, 111 U.S. App.D.C. 361, 297 F.2d 438 (1961).

5. 12 D.C.Code § 301(1) (1967).

6. Umhau v. Bazzuro, 76 U.S.App.D.C. 394, 396, 133 F.2d 356, 358 (1942); Johnson v. Thomas, 23 App.D.C. 141, 152 (1904), appeal dismissed, 197 U.S. 619, 25 S.Ct. 797, 49 L.Ed. 909 (1905).

7. Kogod v. Cogito, 91 U.S.App.D.C. 284, 200 F.2d 743 (1952).

but rather was that of Mrs. Purcell, who cleared it when it became blocked.

The record also discloses, from uncontradicted testimony of appellee, that all other properties along that block are similarly about two and one-half feet off the survey lines, and that if record boundaries are followed, appellee would own two and one-half feet of the living room of his neighbor's house which adjoins his on the south.

The rebuttal evidence by the record owner was not sufficient for us to say the trial court erred. First, appellants asserted that the footing of their house extends underground into the disputed area between the house. This would hardly seem to rebut open usage by appellee and predecessors of what was visible above ground. Moreover, since appellants had sealed the bricks along the walk to prevent seepage into their basement, they were never able to dig down to see if the abutment actually encroached into the disputed area.

Appellants also claim that the drainage from their lot over a period proved that the use by the appellee of the walkway area was not "exclusive." Appellants produced no evidence to show that their predecessors built the ten inch drain, or shared in its building; and the effect of the drain is to benefit appellee (and his predecessors) by keeping the natural drainage, from the higher lot of appellants, channeled and away from the rest of the five-foot walk.

■ Appellants stress that the Riggs Bank, the trustee for the two life tenants from whom appellee bought his lot, in no way claimed ownership of the strip and indeed did not even know it existed.

However, our jurisdiction recognizes the doctrine that a claim of adverse possession may be rooted in ignorance or mistake.[8]

■ Finally, appellants bring up the point that for the entire period, they and their predecessors in title have paid taxes upon the property. But the tax assessor routinely follows the record title. Payment of taxes is, of course, strong evidence of a claim of title when paid by someone other than the record owner. See Holtzman v. Douglas, 5 App. D. C., 397, 410–411 (1895), aff'd 168 U.S. 278, 18 S.Ct. 65, 42 L.Ed. 466 (1897).[9] Where all that is shown is that the record owner, in the course of paying taxes for a lot he concededly owns, also pays an amount ascribable to a small border strip, this does not negative another's adverse possession of that strip.

This case seems even stronger for the claim of adverse possession than Brumbaugh v. Gompers,[10] where the record owner built a fence inside his property line. That court said:

The evidence is uncontradicted that for a period of more than 30 years the eastern boundary of lot 13 [that of the adverse claimant] was not the line as surveyed for the sale to the appellees, but the line claimed by appellants and formed by clearly defined boundaries. In our view, no clearer case of adverse possession could be made.

Another case where the record owner's action in building a fence inside his boundary led to his losing the land beyond the fence by adverse possession is Knight v. Hersh, 111 U.S.App.D.C. 361, 297 F.2d 438 (1961).

8. It suffices if there was an intent to possess the disputed area, even if this intent was grounded on ignorance or mistaken notions. Neale v. Lee, 8 Mackay 5, 19 D.C. 5 (1890); Rudolph v. Peters, 35 App.D.C. 438 (1910); Welch v. Unknown Heirs, 96 U.S.App.D.C. 412, 226 F.2d 776 (1955); Johnson v. Thomas, supra note 6. Thus the trustee-bank may establish title to the disputed strip on the basis of the open use by its beneficiaries whether or not the bank or beneficiaries knew that this use of the entire yard and walkway violated the true boundary lines.

9. Faulks v. Schrider, 72 App.D.C. 308, 114 F.2d 587 (1940), applied a statute creating a presumption of adverse possession for undeveloped and unimproved land where taxes were paid by the claimant.

10. 50 App.D.C. 130 at 132, 269 F. 472 at 474 (1920).

■ Lest we be misunderstood as establishing a conclusive "fence-out rule" a word of caution is warranted. Typically, the decided cases involve fences, or other structures forming a boundary, built by the adverse possessor. Therefore, his trespass and building of the structure are themselves acts of adverse possession that should put an attentive record owner upon notice that an adverse claimant exists. However, when the record owner builds the structure inside his boundary—and there are reasons why he might decide to do so [11]—then the building and maintenance of the structure are not themselves indicia of adverse possession, and being his own acts they of course do not put the record owner on notice of an adverse claim by someone else. Hence, the building or fencing-out of land plus mere non-user by the record land owner do not suffice to establish a claim of adverse possession. There must also be evidence of open and notorious adverse possession, up to the fence or structure. In this case there is such evidence.

Appellants did not even produce evidence that the walkway was built by their predecessor, or jointly built by him. With such evidence the case might have stood in a different posture; it might have permitted the argument that each of the landowners was a part owner and licensee (or cross-licensee) of a walk to be used by both, so that use by the appellee—being with the permission of appellants (and predecessors)—was not adverse possession. But there was no evidence of when the walk was built, or by whom. All the evidence shows is that the visible indicia after 1938, from both sides of the strip, concerning active possession and use, indicate that the strip was part of the property to the south and no part of the property to the north.

■■ A final point before concluding. Appellants state that they need access to the strip for maintaining the south wall, for an exhaust fan, for possible emergency entry in case of fire, and for continued drainage from their lot. They pointed out at oral argument that in the District, where natural water is considered a common enemy,[12] a judgment of title in the appellee would enable him or his successor to change the contour of the land to back up water onto appellants' property. If appellee were to close the drain, appellants could be greatly injured. Since there is no evidence as to who built the drain, appellants are not assured of protection against this damage.[13] He who demands equity must do it. We feel that equity dictates that the court provide not only that appellee reimburse appellants for back taxes, as the District Court ordered, but also that the declaration of title in appellee be conditioned on appellee's granting appellants and their successors an easement allowing reasonable use of the strip for wall maintenance, continued clearance for the exhaust fan, and continued and adequate drainage for appellants' back lot. We do not provide for further easement, since appellants may have recourse to the emergency doctrine in tort if other crises should arise.[14]

In essence the decision is affirmed but the cause will be remanded so that the decree may be modified in accordance with this opinion, in the relatively minor respects noted, so as to provide the protection indicated.

So ordered.

11. The landowner may wish to err on the side of caution, to avoid the chance of straying over the boundary line without the expense of surveying, by building inside the line he thinks exists. Another might wish to use a present structure, such as a wall of a house, as a partial support. Another might be motivated by aesthetic considerations.

12. United States v. Shapiro, Inc., 92 U.S. App.D.C. 91, 202 F.2d 459 (1953).

13. If appellants' predecessor took any part in its building, they could call on equity to estop appellee from closing it. *See* 93 C.J.S. Waters § 116 (1956).

14. *See, e. g.,* Ploof v. Putnam, 81 Vt. 471, 71 A. 188 (1908); Vincent v. Lake Erie Transp. Co., 109 Minn. 456, 124 N.W. 221 (1910).