**Lawrence S. SMITH, Appellant,**

v.

**Jean TIPPETT, Appellee.**

**No. 88–125.**

District of Columbia Court of Appeals.

Argued Oct. 11, 1989.
Decided Feb. 7, 1990.

---

Paul D. Pearlstein, with whom Brent R. Jacques, Washington, D.C., was on the brief, for appellant.

C. Francis Murphy, Washington, D.C., for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

"Something there is that doesn't love a wall."[1]  In this case we are called upon to

---

1. Robert Frost, *Mending Wall* (1914).

resolve a controversy between neighbors about a wall of modest dimensions which was constructed in 1935 or even earlier and which stood in peace and tranquility until its location became the subject of litigation in 1986. Appellant Lawrence S. Smith contends that the structure intrudes into a right of way or easement in which he has an interest. He asks us to hold that this wall, like its once more formidable counterparts in Jericho and Berlin, must now come tumbling down, or must at least be removed from its present location. Appellee Jean Tippett defends on the ground that her predecessors in interest acquired title over the portion of the right of way on which the wall is located under the doctrine of adverse possession and passed good title on to her. Arguing that the wall had been standing for more than half a century without inconveniencing anyone or generating any dissension until Mr. Smith demanded its removal shortly before he instituted this action, Ms. Tippett asks that the structure be permitted to remain in place. The trial judge ruled in Ms. Tippett's favor. We affirm.

## I

### THE FACTS

In 1898, one John H. Ward created a subdivision of certain real property located near the intersection of Decatur Place and 22nd Street in northwest Washington, D.C. The subdivision included four lots, numbered 40, 41, 42 and 43.[2] A four-foot wide easement was created at the rear of Lots 40, 41 and 42, for the benefit of the owners of those lots and of Lot 43, which abuts the easement area at its southern terminus. The easement area crosses Lots 42, 41 and 40, and its northernmost section opens on to Decatur Place.

As initially constructed, the easement took the physical form of a concrete walkway which is three feet wide, rather than four feet as reflected in the original plat. The walkway is bounded on the west side by the eastern wall of a building which is located on property known as Lot 39. On the east side of Lot 40 (Ms. Tippett's property), the walkway is bounded by the brick wall which is the subject of this controversy, and which occupies about twelve inches of the easement area. The walkway continues across Lot 41, which is owned by Charles and Elaine Dym,[3] and Lot 42, which is Mr. Smith's property.

The brick wall is fifteen inches high at its northern end. The ground slopes to the south, and the wall is therefore considerably higher (forty-nine inches) at its southern terminus. The structure encloses a courtyard and serves as a retaining wall for Ms. Tippett's property.

Appellant Smith is, as we have noted, the record owner of Lot 42. He and his wife hold the property as tenants by the entirety, having received it by a deed dated May 2, 1950 from Douglas Smith and Katherine Smith. Mr. Smith's deed provides that his property is subject to a right-of-way "for alley purposes" over the rear four feet of the lot.

Ms. Tippett acquired Lot 40 on November 17, 1976 by deed from Samuel Phillip Caper and his wife, Jane. The Capers had become the owners of the property by deed dated November 21, 1973 from Ruth Blaine Piggot. Ms. Piggot had owned the lot for forty-two years, having acquired it by deed dated July 31, 1929 from Charles S. Piggot. All of the deeds in Ms. Tippett's chain of title also refer, directly or indirectly,[4] to a four-foot right of way. At trial, the parties

---

**2.** The lot numbers ascend from north to south, so that Lot 40 is the northernmost and Lot 43 the southernmost of the four. The easement is at the western end of Lots 40, 41 and 42. Lot 39 lies west of the easement.

**3.** A separate action by Smith against the Dyms was recently decided by this court in an unpublished Memorandum Opinion and Judgment, *Dym v. Smith,* Nos. 88–448 & 88–463 (D.C. December 28, 1989).

**4.** The deed from Ms. Piggot to the Capers makes reference to the plat on which the original four-foot easement was recorded. We treat this allusion as equivalent to a direct recitation in the deed that the easement exists. *See Howenstein Realty Corp. v. Richardson,* 77 U.S.App.D.C. 299, 301, 135 F.2d 803, 805 (1943).

stipulated to the testimony of the son of Ruth Blaine Piggot, who related that the wall which is the subject of this controversy had stood on the premises at least since 1935.

On November 26, 1986, Mr. Smith, who had commissioned a survey of the property and discovered that the wall intruded into the original easement, filed this suit against Ms. Tippett. He requested the Superior Court to order Ms. Tippett to remove the encroaching wall from the twelve inches of the easement area which it occupied.[5] Following a bench trial, the trial judge, Honorable George H. Goodrich, held that the easement in the area occupied by the wall had been extinguished by adverse possession at least as early as 1950, the wall having been in existence by that time for the fifteen-year statutory period. *See* D.C.Code § 12–301(1) (1989). The court further held that the conveyance of the property to Ms. Tippett in 1976 by a deed which ostensibly recognized the original four-foot easement did not have the effect of renewing or creating an extension of the easement into the area occupied by the wall. This appeal followed.

## II

## ADVERSE POSSESSION

### A. General Considerations

To sustain her position that what concededly used to be a four-foot easement is now only a three-foot easement, and that the wall over which the parties have crossed swords is therefore located on her property, Ms. Tippett relies exclusively on the defense of adverse possession. In doing so, she invokes a doctrine of ancient vintage and somewhat amorphous scope.

In medieval days, an owner of land who had been dispossessed of his property (the disseisee) had the legal right to oust the dispossessor (the disseisor) by force. If he failed to do so in timely fashion, his right to this remedy—the only one available to him—lapsed. *See* 5 G.W. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY, § 2540 at 573–74 (1979) (hereinafter THOMPSON). To use the phraseology of the age, the disseisin effected a change in the seisin, and hence the legal title, from the disseisee to the disseisor. *Id.* at 574.

Fortunately, the days of ejection by force (*vi et armis*) are largely behind us, *cf. Mendes v. Johnson*, 389 A.2d 781 (D.C. 1978) (*en banc*), but the basic principle remains the same. In order to counteract the intrusion of the modern-day counterpart of the disseisor, the record owner (today's disseisee), like his feudal predecessor, must act with reasonable dispatch. Rather than taking the axe to the intruder before the latter gains title, however, the record owner must file suit to recover possession within the statutory limitation period. If he fails to do so before the statute runs, then a wrongdoer who has adversely occupied the record owner's property, whether intentionally or by mistake, may become its rightful owner.

It has been said that "[a]dverse possession is the law of the landless, the have-nots," 5 THOMPSON, *supra*, § 2540 at 573," and the doctrine provides means by which a persistent havenot may become a have. The present case, however, illustrates the reality that the defense of adverse possession is not restricted to paupers, but is available to other folks as well.

### B. Nature and Elements of Adverse Possession

The purpose of the doctrine of adverse possession as it exists today has been well described as follows:

"Adverse possession" functions as a method of transferring interests in land without the consent of the prior owner, and even in spite of the dissent of such owner. It rests upon social judgments that there should be a restricted duration for the assertion of "aging claims," that the elapse of a reasonable time should assure security to a person claiming to be an owner. The theory upon which adverse possession rests is that the adverse possessor may acquire title at such time as an action in ejectment by that

---

**5.** Mr. Smith also sought damages. He did, however, offer to pay for the moving of the wall.

record owner would be barred by the statute of limitations.

7 R. POWELL, THE LAW OF REAL PROPERTY § 1012(2) at 91–4 (Rev. ed. 1989) (hereinafter POWELL).[6]

■ To establish title by adverse possession, a claimant must demonstrate actual, open and notorious, exclusive, continuous, and hostile possession of the premises for the prescribed statutory period under a claim of right or title. *Reid v. Anderson*, 13 App.D.C. 30, 36 (1898); *see generally* 5 POWELL, *supra*, § 1013(1), at 91–11; 7 THOMPSON, *supra*, § 2543, at 604. It is undisputed that an easement is a property right which may be extinguished by adverse possession. Annotation, *Loss of a Private Easement by Nonuser or Adverse Possession*, 25 A.L.R.2d 1265, 1322 (1952), and authorities cited.

■ Courts presume that one who occupies the land of another does so with the latter's consent, and adversity must be established by clear and convincing evidence. *Boese v. Crane*, 182 Kan. 777, 324 P.2d 188, 193–94 (1958); *see also* 5 THOMPSON, *supra*, § 2544 at 610–12. They also indulge a presumption, however, that possession is adverse whenever there is open and continuous use of another's land for the statutory period, and this presumption is effective to establish title in the absence of evidence to the contrary. *Gary v. Dane*, 133 U.S.App.D.C. 397, 399, 411 F.2d 711, 713 (1969); *see also Kogod v. Cogito*, 91 U.S.App.D.C. 284, 286, 200 F.2d 743, 745 (1952).

### C. Hostility and Exclusiveness

In the present case, there is no dispute that the wall has encroached twelve inches onto the original four-foot right of way for more than the fifteen-year statutory period and that its presence has been not only actual and continuous, but also open and notorious—it would surely have been self-defeating to attempt to conceal a wall. The principal issue is whether the possession by Ms. Tippett and her predecessors in

title has been "exclusive" and "hostile," as she contends, or merely permissive, as Mr. Smith asserts.

■ " 'Exclusive' possession, for the purpose of establishing adversity, means that the claimant holds possession of the property for himself as his own and not for another." 5 POWELL, *supra*, § 1013(2) at 91–19. If a claimant's possession meets these criteria, his possession need not be absolutely exclusive. *Id.* at 91–21. "A general statement of the element of exclusivity is that the adverse claimant's possession cannot be shared with the true owner." J.P. HAND & J.C. SMITH, NEIGHBORING PROPERTY OWNERS, § 6.06 at 135 (1988), and authorities cited at n. 44. Possession is exclusive if it is of a type that would be expected of a true owner of the land in question. *Id.; see Crites v. Koch*, 49 Wash.App. 171, 175, 741 P.2d 1005, 1008 (1987). In the present case, the issue of exclusivity is closely related to the question of hostility, and the latter element is the principal focus of the dispute between the parties.

■ When used in the context of adverse possession, "hostile" is a term of art. It does not imply ill will. 7 POWELL, *supra*, § 1013(2) at 91–18; 5 THOMPSON, *supra*, § 2548 at 627. A leading commentator has aptly capsulized the concept as follows:

> In order to establish adverse possession, the possession must be openly hostile. "Hostile" possession has been defined as possession that is opposed and antagonistic to all other claims, and which conveys the clear message that the possessor intends to possess the land as his own. It is not necessary that he intend to take away from the owner something which he knows to belong to another or even that he be indifferent concerning the legal title. "It is the intent to possess, and not the intent to take irrespective of his right, which governs."

7 POWELL, *supra*, § 1013(2) at 91–17 (citations omitted).

---

6. This court has said that the doctrine of adverse possession is directed, in part, against "the evils of absentee landlordism." *Aleotti v. Whit-*

*aker Bros. Business Machines, Inc.*, 427 A.2d 919, 923 (D.C.1981).

## D. Mistaken Boundaries

■ Claims of adverse possession frequently arise where, as here, an apparent misunderstanding as to the location of a property line is discovered many years after the fact. "The more widely accepted view is that an adverse claim, otherwise valid, is not defeated by an initial mistake as to where the claimant's property ends and the neighbor's property actually begins." *Id.* § 1013(2) at 91–31.

> In the case of line fences, the majority rule permits adverse possession even under a mistaken belief as to title, where the adverse possessor had an intent to possess up to the claimed line, even though [the claimed line was] not the legal boundary.

5 THOMPSON, *supra,* § 2548 at 632 (citations omitted).

The construction of improvements on the property, such as a wall or a fence, will ordinarily support a finding of adverse possession, for it conveys the message that the occupant intends to possess the land as his own. 7 POWELL, *supra,* § 1013(2) at 91–44 to 91–47; *see also* discussion at pp. 10–11 *infra.* Although fencing is not a prerequisite to a successful claim of adverse possession, it is one of the strongest indications of adversity. *Id.* § 1014(1) at 91–53 to 91–54.

The majority or Connecticut rule, *see French v. Pearce,* 8 Conn. 439 (1831), which recognizes adverse possession even where the occupancy began as a result of a mistaken trespass rather than an intentional one, rests on sound reasoning. *See* NEIGHBORING PROPERTY OWNERS, *supra,* § 6.05 at 133–34. In any case in which title by adverse possession is claimed, the initial possession must have come about either by mistake or by deliberate intrusion. "To limit the doctrine of adverse possession to the latter type places a premium on intentional wrongdoing, contrary to fundamental justice and policy." 7 POWELL, *supra,* § 1013(2) at 9–33, citing *Woodward v. Far-*

*is,* 109 Cal. 12, 41 P. 781 (1895); *see also Sorensen v. Costa,* 32 Cal.2d 453, 196 P.2d 900 (1948); NEIGHBORING PROPERTY OWNERS, *supra,* § 6.05 at 133.[7]

Courts in the District of Columbia have long subscribed to the majority rule described above, and have held that adverse possession has been established in cases in which the claimant's occupancy resulted from a mistake as to the correct boundary line, especially where the claimant has constructed improvements on the disputed property. In *Neale v. Lee,* 19 D.C. (8 Mackey) 5 (1890), the wall of the plaintiff's house was erected eight inches inside the defendant's lot. The problem was not discovered until many years later. Confronting the question whether the doctrine of adverse possession applies to a case of confused boundaries, the court held that even though a mistake was made as to the true line at the time when the house was constructed, physical occupancy of the defendant's land by the wall for the statutory period created title in the plaintiff by adverse possession. The court held that the erection of permanent improvements bespeaks adversity, and that

> possession of all that lay within this assumed line was necessarily hostile to the owner of the adjoining lot. The latter was at once put to his action and the Statute of Limitations began to run.

*Id.* at 21.

In *Brumbaugh v. Gompers,* 50 App.D.C. 130, 269 F. 472 (1920), the record owner had built a fence inside his property line. Two walls of the adverse claimant's building protruded over the record owner's property. These conditions existed for thirty years, well in excess of the statutory limitation period. The court held that adverse possession had been established:

> The evidence is uncontradicted that for a period of more than 30 years the eastern boundary of lot 13 [that of the adverse claimant] was not the line as surveyed

---

**7.** The minority or Maine rule, based on *Preble v. Maine Central Railroad Co.,* 85 Me. 260, 27 A. 149 (1893), has received extensive criticism because it is historically unsound, practically inexpedient, and results in better treatment for in-

tentional wrongdoers. *Mannillo v. Gorski,* 54 N.J. 378, 382–88, 255 A.2d 258, 260–63 (1969) (discarding Maine rule); *see also* NEIGHBORING PROPERTY OWNERS, *supra,* § 6.05 at 134.

for the sale to appellees, but the line claimed by appellants and formed by clearly defined boundaries. In our view, no clearer case of adverse possession could be made.

*Id.* at 132, 269 F. at 474.

In *Gary v. Dane, supra,* another case involving a mistake over the location of a boundary line, the court reiterated the principles of *Neale v. Lee* and *Brumbaugh v. Gompers,* citing both cases by name. The court explained, in pertinent part, that

> our jurisdiction recognizes the doctrine that a claim of adverse possession may be rooted in ignorance or mistake.
>
> \*　\*　\*　\*　\*　\*
>
> It suffices if there was an intent to possess the disputed area, even if this intent was grounded on ignorance or mistaken notions.

133 U.S.App.D.C. at 400 & n. 8, 411 F.2d at 714 & n. 8.[8]

### E. The Precedents Applied

■ Although the trial judge did not explicitly discuss the elements of adverse possession, we think that there is a substantial basis in the evidence and in the applicable law for his finding that title passed to Ms. Piggot no later than in 1950. According to the stipulated evidence, the intrusion had by that time existed for at least fifteen years. It was continuous, open and notorious. Under District of Columbia law, as well as the majority rule elsewhere, it matters not whether the initial intrusion was intentional or the result of a mistake as to the boundary line. The construction of the wall was an exercise of dominion. The judge could reasonably conclude that, as of 1950, Ms. Tippett's predecessor in title owned the portion of the easement occupied by the wall by adverse possession.[9]

Mr. Smith seeks to distinguish *Neale* and *Brumbaugh* upon the ground that the wall built by Ms. Tippett's predecessor was a less substantial improvement than those constructed by the claimants in the earlier cases. We think, however, that the trial judge could reasonably find, as he implicitly did, that the erection of the wall conveyed the clear message that Ms. Piggot intended to possess as her own, and no one else's, the property on which it stood. *See* 7 POWELL, *supra,* § 1013(2) at 91–17.

### III

### THE SUBSEQUENT DEEDS

■ Mr. Smith contends that even if Ms. Piggot obtained title by adverse possession in 1950 to that portion of the right of way which was occupied by the wall, the preexisting easement was recreated when the property was transferred to Ms. Tippett by a deed which explicitly recognized the continued existence of a right of way four feet wide. We cannot agree.

"Title to property acquired by adverse possession matures into an absolute fee interest after the statutory prescriptive period has expired." 7 POWELL, *supra,* § 1017 at 91–77. The Supreme Court has held that the lapse of time provided by the statute of limitations not only bars the original owner's remedy, but also extinguishes his right, and vests a perfect title in the adverse holder. *Bicknell v. Comstock,* 113 U.S. 149, 152, 5 S.Ct. 399, 400, 28 L.Ed. 962 (1885). *Accord, Sharon v. Tucker,* 144 U.S. 533, 542–45, 12 S.Ct. 720, 721–723, 36 L.Ed. 532 (1892) (decided under District of Columbia law). Title to land acquired by adverse possession is as perfect as title acquired by deed from the record owner. *Scott v. Herrell,* 31 App. D.C. 45, 53 (1908).[10] As the Supreme Court

---

**8.** The court in *Gary v. Dane* went on to discuss the distinction between "fencing in" and "fencing out," *id.* at 401, 411 F.2d at 715, and Mr. Smith apparently contends that this discussion somehow reduces the force of *Neale* and *Brumbaugh.* We conclude, however, that this part of the opinion has no bearing on the facts of the instant case, and that the decision as a whole reinforces the earlier precedents rather than attenuating them in any way.

**9.** We can set aside the trial judge's findings as to adversity only if they are clearly erroneous and without evidence to support them. *Aleotti, supra,* 427 A.2d at 921.

**10.** Despite the validity of such title, further proceedings may be required to render it marketable. *See* D.C.Code § 16–3301 (1989).

of Washington explained in *El Cerrito, Inc. v. Ryndak*, 60 Wash.2d 847, 855, 376 P.2d 528, 532 (1963):

> When real property has been held by adverse possession for [the period described by statute], such possession ripens into an original title. *Title so acquired by the adverse possessor cannot be divested by acts other than those required where title was acquired by deed.* (Emphasis added).

*See also Baker v. Oakwood*, 123 N.Y. 16, 25 N.E. 312 (1890); *Connell v. Ellison*, 86 A.D.2d 943, 944, 448 N.Y.S.2d 580, 581 (3d Dept.1982); 5 THOMPSON, *supra*, § 2541, at 585–87.

These authorities conclusively dispose of Mr. Smith's claim that the easement was re-created. He is a complete stranger to the deed from Ms. Piggot to the Capers in 1973 and to the conveyance from the Capers to Ms. Tippett three years later. If Ms. Piggot had obtained title to the disputed portion of the easement by quitclaim deeds from Mr. Smith and the other easement holders, rather than by adverse possession, Mr. Smith surely could not claim that the contents of a later transaction between Ms. Piggot and the Capers, or one between the Capers and Ms. Tippett, had somehow undone the prior quitclaims and caused a long dead easement to be reborn. The case law cited above conclusively establishes that Ms. Piggot's acquisition of title by adverse possession had the same effect as if she had secured it by deed. Mr. Smith's interest in the contents of a conveyance between two strangers to him is just as remote as it would be if the disputed portion of the easement had initially been extinguished by deed rather than by adverse possession.

Mr. Smith argues that the deed from Ms. Piggot to the Capers is the best evidence of what Ms. Piggot intended to convey, and that the same principle holds true for the Capers' deed to Ms. Tippett. Since each of these deeds recognized a four-foot easement, he contends, then such an easement must continue to exist. Assuming, *arguendo*, that Mr. Smith's conception of what constitutes the best evidence is correct,[11] then the grantors of each of those deeds might perhaps be heard to claim that the grantees took only what was in the record title, and no more. Anything that the grantees did not take, however, would surely still belong to the grantors, and not to a stranger.

Mr. Smith's interest had been extinguished long before the transactions involving Ms. Piggot, the Capers and Ms. Tippett. There is simply no basis in fact or law for his claim that the fortuitous circumstance that Lot 40 was transferred by deed twice in the 1970's could revive his own former interest, which had met its demise in 1950.[12]

## IV

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is hereby

*Affirmed.*

---

**11.** A more probable explanation of the discrepancy between the four-foot easement of record and the situation which actually existed is that, since no survey was conducted, the parties were simply unaware of the problem.

**12.** One might perhaps argue that the recitation or recognition in the 1973 and 1976 deeds that a four-foot easement exists should be considered by the trier of fact in determining whether the possession by Ms. Tippett's predecessors was adverse. It does not appear that this argument was made to Judge Goodrich, however, at least in those terms. Even if it had been, it certainly does not *compel* a finding of permissiveness or render erroneous the judge's finding of adversity. *See* note 9, *supra*.