*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CV-929

BOARD OF TRUSTEES, THE GRAND LODGE OF THE INDEPENDENT ORDER OF THE ODD FELLOWS OF THE DISTRICT OF COLUMBIA, APPELLANT,

v.

CARMINE'S DC, LLC, *ET AL.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAR-7709-13)

(Hon. Brian F. Holeman, Trial Judge)

(Argued December 4, 2018            Decided February 27, 2020)

*Michael S. Steadman Jr.*, with whom *Michael N. Russo, Jr.* was on the brief, for appellant.

*Lance Robinson*, with whom *Mark London* was on the brief, for appellees.

Before FISHER and EASTERLY, *Associate Judges*, and FERREN, *Senior Judge*.

EASTERLY, *Associate Judge*: This court has recognized that, "[w]here the right to use real property is at issue, . . . [c]larity is best." *Martin v. Bicknell*, 99 A.3d 705, 706 (D.C. 2014). More particularly, the creation of "express easement[s], acknowledged in a deed conveying ownership of property, is always

preferred under the law." *Id.* at 708. Given this preference, courts should not be less inclined to enforce the terms of a written agreement memorializing a grant of an easement in a bargained-for exchange; rather we should enforce such agreements just as we would any other valid contract.

Here, the parties signed a written agreement whereby the owner of a building agreed to sell its immediately adjacent property, with the acknowledgement that this property would be developed, but reserved the right to "install and operate" a restaurant exhaust system in an area outside its building. The terms of the agreement further provided that this right of use was binding on the purchaser's "successors and assigns" and would "run[] with the land." This unambiguous language created what the buyer, the seller, and later the developer, all recognized was an "easement," i.e., an "interest in the land owned by another person, consisting in the right to use or control the land for a specific limited purpose." *Id.* Moreover, the surrounding circumstances of this express easement—the fact that it was repeatedly reaffirmed, publicly recorded, and concretely honored—reinforced the obvious aim of the plain language to create an easement.

The trial court, however, concluded that the language of this agreement was not specific enough to create an express easement. In addition, it determined that the creation of an express easement was defeated either because the agreement omitted nonmaterial terms—the easement's exact location—or because of the seller's nonuse of the easement it had contracted to possess. To the extent the trial court determined its analysis and conclusion was compelled by our precedent, it was mistaken. Accordingly, we reverse and remand for entry of the requested declaratory judgment that appellant, the Board of Trustees, The Grand Lodge of the Independent Order of Odd Fellows of the District of Columbia (the "Odd Fellows"), possesses an express easement to a vent shaft located on property now owned by Jemal's Douglas Stereo, LLC and leased by Carmine's DC, LLC, the appellees ("Jemal's/Carmine's").

## I. Facts and Procedural History

The Odd Fellows[1] acquired the land currently located at 419 7th Street NW in 1860 and constructed the seven-story Mayer Building on that site in 1917. The

---

[1] The Independent Order of Odd Fellows (also referred to in legal documents as IOOF) is a fraternal organization that originated in England and established its first lodge in the United States in about 1806. *See History*, Indep. Ord. of Odd Fellows, The Sovereign Grand Lodge, https://perma.cc/YC5G-KBV3.

United States General Services Administration ("GSA") subsequently acquired the surrounding lots of land, which were separated from the Mayer Building by a public alleyway.  The diagram in Appendix A shows the locations of the alley, the Mayer Building (labeled "IOOF Property"), and GSA's lots surrounding the Mayer Building (labeled "Project Property").

By 1998, GSA had formed a plan to sell its property to a developer.  As part of that process, GSA prepared for the closing of the public alley (the "Alley Land") to allow for construction immediately adjacent to the existing Mayer Building.[2] Because the Odd Fellows owned a reversionary interest to 966 square feet of the Alley Land,[3] GSA negotiated an agreement whereby the Odd Fellows would sell its reversionary interest to GSA in exchange for $85,000.00 and a number of other commitments.  This bargained-for exchange was memorialized in the 1998 Alley Closing Agreement (the "1998 Agreement").

---

[2] *See* D.C. Code §§ 9-202.01 to .15 (2019 Repl.) (providing procedures for the closing of alleys and streets).

[3] When an alley in the District is closed, "title to the land shall revert to or be vested in fee simple to the record owners" surrounding the alley.  D.C. Code § 9-202.12.

The 1998 Agreement expressly provided that the sale of the Odd Fellows' reversionary interest in the Alley Land would be "subject to the easements in favor of [the Odd Fellows] as hereinafter described and upon terms and conditions set forth hereinbelow," including the following:

> If and when GSA's [p]roperty is developed and as a condition for any such development, GSA shall require that the development be designed so as to accommodate or not to preclude the installation and operation of an exterior restaurant exhaust system servicing the Mayer Building. Notwithstanding the prior sentence, the [Odd Fellows] retain[] any and all prevailing rights to install and operate a restaurant exhaust system to service the Mayer Building.

The parties further specified that "[a]ll terms of this Agreement shall be binding upon, and inure to the benefit of and be enforceable by the parties hereto and their respective legal representatives, successors[,] and assigns"; that "[t]he covenants and conditions herein contained shall be deemed real covenants running with the land"; and that the 1998 Agreement would be publicly recorded.

The record before us does not indicate that the 1998 Agreement was itself separately, publicly recorded after its execution. But it was subsequently publicly recorded in 2000 when GSA and the District of Columbia signed a Declaration of Covenants (the "2000 Declaration") pertaining to the property GSA planned to develop, including the reversionary interest in the Alley Land purchased from the

Odd Fellows. In addition to identifying a number of other covenants specific to GSA and the District, the 2000 Declaration incorporated by reference and attached as an exhibit the 1998 Agreement between GSA and the Odd Fellows to create a "single recordable" document. The 2000 Declaration reaffirmed that all of the listed covenants ran with the land and were binding on the parties' respective successors and assigns "in perpetuity." This 2000 Declaration, with the appended 1998 Agreement, was publicly recorded on September 26, 2000.

GSA hired Jefferson at Penn Quarter ("JPI") to develop the property, and, in 2001, the Odd Fellows, GSA, and JPI executed an Estoppel, Assumption, Indemnity, and Termination of Easement Agreement (the "2001 Agreement"). The parties entered into the 2001 Agreement to, in part, "confirm the existing state of facts as to the Alley Closing Agreement" and "establish the future rights and obligations among GSA, [the Odd Fellows,] and JPI or its successor-in-title . . . ."

The 2001 Agreement acknowledged (1) that GSA had, pursuant to the 1998 Agreement, purchased the Odd Fellows' reversionary interest in the alley in consideration for certain commitments by GSA, including the accommodation of an exterior restaurant exhaust system that would service the Mayer Building; (2)

that the alley in question was, in fact, closed[4]; and (3) that the 2000 Declaration (appending the 1998 Agreement) had been executed and recorded. The 2001 Agreement further detailed which portions of the 1998 Agreement remained unperformed, including satisfaction of certain covenants and conditions that the parties labeled "Development Requirements." One unfulfilled Development Requirement was the expectation that JPI would "plan[] the development so that such development can accommodate and not preclude the installation and operation of an exterior restaurant exhaust system servicing the Mayer Building, which shall be operated by [the Odd Fellows]." Finally, the 2001 Agreement provided that its "terms, covenants, conditions, rights, and obligations . . . shall run with the land and shall be binding upon and inure to the benefit of the heirs, successors, executors, administrators, and assigns of the parties hereto."

The 2001 Agreement not only reaffirmed and bound JPI to the 1998 Agreement, but it also appended the 1998 Agreement and JPI's architectural plans

---

[4] The easement "terminated" by the 2001 Agreement was a "Temporary Alley Easement" also created in the 1998 Agreement that gave the Odd Fellows right to use the alley after it sold its reversionary interest in the land to the GSA until development commenced.

for the project (the "Esocoff drawings"),[5] one of which showed a small box consistent with a vent shaft just to the north of the Mayer Building and its property line. See Appendix B. In the 2001 Agreement, the Odd Fellows approved these plans and "confirm[ed] that a project built in substantial accordance with [them would] satisfy the Development Requirements." The 2001 Agreement, with the 1998 Agreement and Esocoff drawings attached, was publicly recorded on May 8, 2001.

Following the 2001 Agreement, the land surrounding the Mayer Building was developed and a vent shaft that could accommodate an exterior restaurant exhaust system was constructed. The shaft was in the location shown on the original Esocoff drawing. It was built on the southernmost wall of 425 7th Street NW, the property immediately north of the Mayer Building.

In 2003, while construction was ongoing, JPI reached out to the Odd Fellows to ask if it wanted to install ductwork for a kitchen vent in the vent shaft JPI had built, explaining that JPI was drywalling the space and it would be more

---

[5] In the trial court, the parties referred to these sketches as the "Esocoff drawings" because they were prepared by JPI's architectural firm, Esocoff & Associates.

difficult and expensive to install ductwork later. The Odd Fellows responded that it had no current plans "to install the necessary equipment" to convert the vent shaft into a restaurant exhaust system, and that if and when it leased the space to a restaurant, it envisioned that the restaurant owner would bear the cost of installing this equipment. In the meantime, the Odd Fellows proposed to use the shaft either as a "fresh air duct" or to seal both its ends. In an April 2004 letter, JPI expressly voiced "no objection" to the former proposal and by its silence voiced no objection to the latter. The Odd Fellows ended up not needing a fresh air duct. It did not have any further communication about the vent shaft with JPI.

In 2007, JPI sold 425 7th Street NW to Jemal's Douglas Stereo, LLC. ("Jemal's"). The Special Warranty Deed transferring title of the property acknowledged both the 2000 Declaration and the 2001 Agreement. Attached to the Contract of Sale between the two companies were drawings of the property completed by Esocoff & Associates that included a small box consistent with the vent shaft in the southernmost wall of 425 7th Street NW,[6] which, in that diagram, was labeled "Retail Space A." See Appendix C. In 2009, Jemal's entered into a

---

[6] Both the drawing attached to the 2001 Agreement and the drawing attached to the Contract of Sale show the box in approximately the same location. Compare Appendix B, with Appendix C.

fifteen-year lease with Carmine's Restaurant for a part of 425 7th Street NW, including the space in which the vent shaft built by JPI for the Odd Fellows is located. Sometime between 2009 and June 2010, Carmine's began using the shaft to satisfy its own business needs.

Upon learning of Carmine's use of the vent shaft, the Odd Fellows sent two letters to Jemal's/Carmine's in June and July 2010, demanding that Carmine's immediately cease its use. In November 2013, the Odd Fellows filed a complaint against Jemal's/Carmine's, which it later amended to include a request for a declaratory judgment that it was the dominant tenant of an express easement to use the vent shaft. The Odd Fellows dismissed its other claims, and the case proceeded to a two-day bench trial on the request for declaratory judgment only.

At trial, the Odd Fellows presented witness testimony and documentary evidence—including the 1998 Agreement, the 2000 Declaration, and the 2001 Agreement—regarding its interest in the vent shaft.[7] Jemal's/Carmine's did not dispute the substance of any of these agreements and called just one witness:

---

[7] The Odd Fellows conceded that its interest "is not exclusive or absolute" in scope. *See Martin*, 99 A.3d at 713 (explaining that "servitudes are generally not exclusive" and that the right to use property as articulated in an easement, in particular, is usually "shared" (internal quotation marks omitted)).

James Duncan, a representative from JPI. Mr. Duncan testified that, at the time of the 2001 Agreement, the building design was not "fully mature" and the exact location of the vent shaft that would service the Mayer Building was not fixed. But he acknowledged that JPI understood there to be an easement agreement with respect to the vent shaft at issue, and that the vent shaft that was constructed in that location was built for the Odd Fellows in order to "keep our end of the bargain" under the 2001 Agreement.

In a written order that incompletely discussed the terms of the 1998 and 2001 Agreements and made no mention of the 2000 Declaration, the trial court ruled that no express easement had been created.[8] The court noted that "there are no particular words of art necessary to create an easement by express grant," and then considered "three factors" derived from this court's decision in *Katkish v. Pearce*, 490 A.2d 626, 628 (D.C. 1985): "(1) the specificity of the intent of the deed to create an easement . . . , (2) [that] the boundaries of the easement were spelled out in detail and easily found, and (3) the actions of the parties in interest prior to and subsequent to the conveyance." The court determined that the 1998 and 2001 Agreements "d[id] not describe the purported easement with sufficient

---

[8] The trial court also determined that no implied easement had been created. As neither party has challenged this ruling, we do not discuss it.

specificity"; both agreements lacked "a detailed description of the boundaries of the purported easement"; and the Odd Fellows' failure to use the vent shaft "indicate[d] the absence of an expressed easement." The court accordingly entered judgment in favor of Jemal's/Carmine's. This appeal followed.

## II. Analysis

### A.     The Existence of an Express Easement

Whether an easement has been created is a question of law that we review de novo. *Martin*, 99 A.3d at 707. An easement is "an interest in land owned by another person, consisting in the right to use or control the land for a specific limited purpose." *Id.* at 708 (internal quotation marks omitted). This interest "runs with the land," Restatement (Third) of Prop.: Servitudes § 1.1(1) (Am. Law Inst. 2000), which is to say that, subject to notice concerns, it is binding on the servient property where the easement is located notwithstanding a change in ownership or occupancy. *See Daro Realty, Inc. v. District of Columbia Zoning Comm'n*, 581 A.2d 295, 305 (D.C. 1990) (explaining that the restrictive covenant in that case "ran with the land," thereby "binding all future owners" to its restrictions).

"An express easement, acknowledged in a deed conveying ownership of property, is always preferred under the law," *Martin*, 99 A.3d at 708, because of the potential "long-term effects" that these interests have "on land use and value," Restatement (Third) of Prop.: Servitudes § 2.2 cmt. a.[9]  An express easement may be created through a contract or conveyance. *Id.* § 2.1(1).  "There are no particular words of art necessary to create an easement by express grant." *Katkish*, 490 A.2d at 628.  As with any dispute regarding a written contract, we look first to the plain language of the purportedly interest-creating document, *id.*, and, if it is clear, that ends our inquiry. *See Found. for Pres. of Historic Georgetown v. Arnold*, 651 A.2d 794, 796 (D.C. 1994) ("Deeds, like contracts, are construed in accordance with the intention of the parties insofar as it can be discerned from the text of the instrument.  If a deed is unambiguous, the court's role is limited to applying the meaning of the words . . . ." (citations and internal quotation marks omitted)).  If it is necessary to look beyond the plain language, we examine the "surrounding circumstances" of the document's execution. *Katkish*, 490 A.2d at 628; *accord*, *Arnold*, 651 A.2d at 796 (explaining that in addition to a document's plain language, "the parties' intention is to be ascertained by examining the document in

_____

[9]  Even so, easements may also be implied or acquired through prescription. *See Martin*, 99 A.3d at 708–14.

light of the circumstances surrounding its execution and, as a final resort, by applying rules of construction"); *see also* Restatement (Third) of Prop.: Servitudes § 2.2 cmt. a (acknowledging that "[t]o avoid unfairness, . . . courts generally seek to ascertain and give effect to the intentions of the parties, even though imperfectly expressed").

Here, the terms of the 1998 Agreement selling the Odd Fellows' reversionary interest in the alley expressly provided that "if and when GSA's property is developed," an event that would likely result in the Mayer Building's being hemmed in by other structures, "GSA [would] require that the development be designed so as to accommodate or not to preclude the installation and operation of an exterior restaurant exhaust system servicing the Mayer Building." The agreement additionally provided that the "[Odd Fellows] retain[] any and all prevailing rights to install and operate a restaurant exhaust system to service the Mayer Building." Read together, *see Bank of Am. N.A. v. District of Columbia*, 80 A.3d 650, 678 (D.C. 2013) ("In interpreting a contract, we consider the document as whole . . . ."), this language expressly created an "easement" as this court has defined that term: it established the Odd Fellows' "interest in land owned by another person"—the land surrounding the Mayer Building, owned by GSA— "consisting in the right to use or control the land . . . for a specific limited

purpose"—the Odd Fellows' right to use that land for an exterior restaurant exhaust system.[10] *Martin*, 99 A.3d at 708.

As "no particular words of art" are "necessary to create an easement by express grant," it does not matter that the parties did not use the word "easement" in this particular provision of the agreement. *Katkish*, 490 A.2d at 628. The parties did, however, use that terminology in one of the introductory paragraphs of the 1998 Agreement, explaining that the Odd Fellows would sell its reversionary interest in the Alley Land to GSA "subject to the easements in favor of [the Odd Fellows] as hereinafter described."[11] Moreover, other language in the 1998

_____

[10] Notably, this agreement is analogous to one of the illustrations of an easement in the Restatement: "O, the owner of Blackacre and Whiteacre, executed and delivered a deed to A conveying fee simple in Whiteacre, subject to the restriction that no structure shall be built, nor shall any vegetation be permitted to grow, on Whiteacre to a height exceeding 25 feet. The deed states that the purpose of the restriction is to protect the view from Blackacre, and that the restriction is intended to run with the land. A servitude burdening Whiteacre and benefiting Blackacre was created." Restatement (Third) of Prop.: Servitudes § 2.1 cmt. b, illus. 2.

[11] We note that this language refers to "easements," plural. For this reason, as well as those stated above, we are unpersuaded by Carmine's/Jemal's argument that it is significant that the parties, in detailing the Odd Fellows' specific rights under the agreement, used the word "easement" just once and not with respect to the right to install and operate a restaurant exhaust system. See *supra* note 4. On these facts, we reject the implication that the failure to use the term "easement" in connection with the right to install and operate an exterior restaurant exhaust

(continued…)

Agreement supports our understanding of this provision as an easement. Specifically, the 1998 Agreement included language that made clear that it did not impose obligations solely on GSA, but rather that "[t]he covenants and conditions . . . contained" in the Agreement would "be deemed real covenants running with the land," and would be publicly recorded so as to be enforceable by the Odd Fellows, its "successors[,] and assigns" against all the world.[12] *See Rose v. Wells Fargo Bank, N.A.*, 73 A.3d 1047, 1052 (D.C. 2013) ("[T]he recordation process is designed to protect a property interest against subsequent bona fide purchasers . . . .").

To the extent that the trial court thought greater specificity of language than this was required to create an express easement, it was mistaken, and its reliance on *Kayfirst Corp. v. Washington Terminal Co.*, 813 F. Supp. 67 (D.D.C. 1993), was misplaced. The federal district court's ruling does not provide much detail about the deed in question, but the defendant's argument that it created an express easement appears to have been based only on the inclusion of "[t]he words

---

(…continued)
system signifies that this obligation was not one that ran with the land, and bound only the parties to the agreement.

   [12] We note that the trial court in its order and Jemal's/Carmine's in their brief to this court omitted discussion of this language.

'improvements, easements, and appurtenances thereto' appearing in the deed habendum." *Id.* at 72 (finding "no evidence of intent on the part of [the contracting parties] to create the easement in question and no detailed description of any easement"). The mere presence of those words in a deed is far less evidence of an easement than we have here, where the 1998 Agreement identified the dominant and servient properties, the purpose of the easement, and its general location (the exterior of the Mayer Building) and specified that the obligation ran with the land.

In addition, the trial court effectively ignored the surrounding circumstances of the execution of the 1998 Agreement, which likewise support an interpretation of the agreement as creating an express easement. The GSA acknowledged the existence of the 1998 Agreement in the 2000 Declaration. The GSA and the Odd Fellows then bound the developer, JPI, to the 1998 Agreement in the 2001 Agreement. Both of these documents reiterated that the commitments contained therein, including the appended 1998 Agreement, would run with the land, and both of these documents were publicly recorded. Additionally, the 2001 Agreement included the Esocoff drawings that depicted a vent shaft positioned outside the north wall of the Mayer Building. See Appendix B. The Odd Fellows approved these plans, confirming that they provided what it had contracted for. JPI subsequently constructed a vent shaft that could accommodate a restaurant exhaust

system in that location, and a representative of JPI testified that this vent shaft was built to "keep our end of the bargain."

By looking instead to other factors to conclude that an express easement had not been created by the 1998 Agreement, the trial court erred. The court focused on the absence of "defin[ed] boundaries" for the restaurant exhaust system and nonuse by Odd Fellows. The court derived these factors from our decision in *Katkish*, but there we merely "agree[d] with the trial court" that, as applied to the facts in *that* case, those were "the important factors." *Katkish*, 490 A.2d at 628. We did not purport to create a definitive test for the creation of express easements, much less one that would override the plain-language understanding of a written contract. See *supra*.

Furthermore, giving dispositive weight to the factors highlighted in *Katkish* is independently flawed because they do not logically apply to the facts of this case. Regarding the absence of defined boundaries for an exterior exhaust system, it was clear that the system would have to be located along one of the three exterior walls of the Mayer Building not facing the street, and it would have been difficult if not impossible to more precisely locate this system when development of the property surrounding the building was only anticipated, and presumably no design

plans existed. Within the context of the 1998 Agreement, the precise boundaries of the exterior restaurant exhaust system were thus a nonmaterial term that did not defeat the creation of an easement. *See Carrollsburg v. Anderson*, 791 A.2d 54, 61 (D.C. 2002) ("Where an easement in land . . . is granted in general terms, without giving definite location and description of it, the location may be subsequently fixed." (internal quotation marks omitted)); *see also Tauber v. Quan*, 938 A.2d 724, 730 (D.C. 2007) ("[A] contract must be sufficiently definite as to its material terms . . . that the promises and performance to be rendered by each party are reasonably certain. . . . [But] all the terms contemplated by [an] agreement need not be fixed with complete and perfect certainty for a contract to have legal efficacy." (footnote and internal quotation marks omitted)). To conclude otherwise would be tantamount to holding, contrary to our precedent, that parties cannot negotiate sales of property for development in return for easements on that land pre-development. *See generally Taylor v. Eureka Inv. Corp.*, 482 A.2d 354 (D.C. 1984).

Regarding the Odd Fellows' nonuse of the constructed vent shaft for the purpose of a restaurant exhaust system, we disagree that this should have factored into the court's reasoning at all. Certainly, use may be a factor in clarifying an intention to grant an easement, but where, as here, that intention is clear, nonuse

cannot defeat the creation of an express easement.[13] *See Brunthaver v. Talty*, 31 App. D.C. 134, 137 (D.C. Cir. 1908) ("Mere neglect to enjoy an easement created by grant has no greater effect to extinguish the right of the grantee thereto than to the freehold to which it is appurtenant."); *see also Faulks v. Schrider*, 99 F.2d 370, 373 (D.C. Cir. 1938) (explaining that "[o]nce title vests [in an easement acquired by express grant], it[] stays vested until it passes by grant, by descent, by adverse possession or by some operation of law such as escheat or forfeiture; but it is elementary that title does not pass by inaction on the part of the owner");[14] *Case v. Morrisette*, 475 F.2d 1300, 1304–05, 1313 (D.C. Cir. 1973) (determining an easement to use the subject property as a parking lot existed even though the promised modifications to allow the property to be used for this purpose were never done, *id.* at 1304–05, because "[e]vents transpiring after activities assertedly creating a property interest have no bearing on the question whether the asserted interest arose," *id.* at 1315).

---

[13] Post creation, lack of use and the unauthorized use of an easement by another may result in the loss of an easement through adverse possession, *see Smith v. Tippett*, 569 A.2d 1186, 1189–90 (D.C. 1990), but no claim of adverse possession has been raised in this case.

[14] *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) (holding that decisions by the United States Court of Appeals for the District of Columbia Circuit published before February 1, 1971, are binding on this court).

### III. Remaining Issues

Jemal's/Carmine's raise a number of other issues, inviting this court to affirm the trial court's determination on alternative grounds. We decline to do so.

First, Jemal's/Carmine's claim that, even if an express easement was created, they had neither actual nor inquiry notice of it. This argument is unpreserved, waived, and meritless. Jemal's/Carmine's never argued at trial that they did not have notice of the 1998 Agreement creating the easement in question, and they never presented any evidence as to this point. *See Clay Props. Inc. v. Wash. Post Co.*, 604 A.2d 890, 894 (D.C. 1992) (explaining that a party claiming to be bona fide purchaser must "establish" that it "acquired the building without notice" of the property interest in question). To the contrary, they conceded they had actual notice of the 2001 Agreement, to which the 1998 Agreement was appended. Their argument was that they did not understand the documents they knew about to create an easement for the Odd Fellows' benefit, which is, in essence, a challenge to the import of the plain language of the 1998 Agreement. We reject this challenge above.

Even if Jemal's/Carmine's had preserved a notice challenge, we would reject it for multiple reasons. Not only did they concededly have actual notice of the 2001 Agreement to which the easement-creating 1998 Agreement was appended, but they also had at least constructive notice by virtue of the fact that (1) the 1998 Agreement was publicly recorded, twice, as an attachment to both the 2000 Declaration and the 2001 Agreement and (2) all of these documents were explicitly referenced in the Special Warranty Deed by which Jemal's took title to the property.[15] *See* D.C. Code § 42-401 (2012 Repl.); *cf. Clay Props.*, 604 A.2d at 894 ("[A] deed conveying an interest in real property is not effective against 'subsequent bona fide purchasers' unless it is recorded.").

Second, Jemal's/Carmine's argue that the Odd Fellows' request for declaratory judgment falls outside of the three-year statute of limitations. They look to the limitations period for trespass and unjust enrichment—the claims the Odd Fellows voluntarily dismissed. But the operative limitations period is that "for the recovery of lands": fifteen years. D.C. Code § 12-301[(a)](1) (2012 Repl.); *cf. Zere v. District of Columbia*, 209 A.3d 94, 97 n.1, 99 (D.C. 2019)

---

[15] In addition, the Contract of Sale between JPI and Jemal's appended drawings showing the vent shaft just inside the south wall of 425 7th Street NW. See Appendix C.

(explaining that an easement is an "interest in land" that may be obtained by prescription, so long as the record owner does not assert their rights to the property "for the statutory period of fifteen years" (internal quotation marks omitted) (citing D.C. Code § 12-301(1))). Relatedly, Jemal's/Carmine's also argue in their brief that declaratory judgment is not an independent cause of action. We have held otherwise. *See McIntosh v. Washington*, 395 A.2d 744, 749 (D.C. 1978) (upholding "the Superior Court's authority to award declaratory judgments in cases within [its] jurisdiction").

Finally, Jemal's/Carmine's claim that it would be "inequitable to enforce [the Odd Fellows'] purported easement" because of the difficulty in restoring the vent shaft to house a restaurant exhaust system. This plea for equity was not raised in the trial court. *See Pajic v. Foote Props., LLC*, 72 A.3d 140, 145–46 (D.C. 2013) (explaining that, as an appellate court, our review is generally limited to preserved claims).[16] Moreover, Jemal's/Carmine's concerns about enforcement of access to the easement are premature, as the only request for relief in this case was declaratory judgment establishing that an easement was, in fact, created. We hold

---

[16] For the same reason, we decline to address Jemal's/Carmine's contention that granting judgment in favor of the Odd Fellows would be tantamount to rendering an advisory opinion.

now that it was; a declaratory judgment should have been entered in favor of the Odd Fellows.

## IV.   Conclusion

For the foregoing reasons, we hold that an express easement was created and its location subsequently fixed as the vent shaft located in 425 7th Street NW, along the southernmost wall abutting the Mayer Building.  The judgment of the trial court is reversed, and we remand with instructions to enter declaratory judgment for the Odd Fellows.

*So ordered.*

# APPENDIX A



## APPENDIX B



# APPENDIX C

